[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Review of the File
This matter first came to the court by virtue of summons and complaint, which complaint was dated April 25, 2001 and returnable May 15, 2001, in which complaint the plaintiff petitioner husband sought a dissolution of the marriage, an allowance to prosecute, a fair and equitable property settlement, an allocation of debts and such other relief as in equity pertains.
With the complaint were filed the usual form automatic orders as well as the return by the marshal indicating abode service on the defendant.
The defendant filed an appearance on May 16, 2001. This was a pro se appearance.
On May 18, 2001, the plaintiff, through counsel, filed a motion to enjoin pendente lite as concerns certain claimed assets of the defendant and, incident thereto, the court entered an order on June 4, 2001 accepting an agreement presented to the court at that time. This was approved by the court, Kenefick, J.
The aforementioned agreement approved by Judge Kenefick allowed the defendant to use a portion of her assets to pay for tuition, usual and customary household expenses and attorney's fees.
On June 4, 2001, the defendant appeared by counsel. CT Page 4314
On June 4, 2001, counsel for the defendant filed an objection to the motion to enjoin earlier adverted to.
On June 6, 2001, the defendant filed a motion for alimony, return of personal property and an allocation of debt pendente lite.
On June 6, 2001, counsel for the defendant filed an answer and a cross complaint and in the cross complaint requested a dissolution of the marriage, an allowance to prosecute, a fair and equitable property settlement, an allocation of debts, such other relief as in equity appertains and a restoration of the defendant's maiden name of Meehan.
On June 6, 2001, counsel for the defendant filed a contempt motion but it does not appear that the motion was acted upon.
On June 6, 2001, the plaintiff filed another motion to enjoin as concerns the automobile owned and/or operated by the defendant; to wit, a certain BMW-M3 automobile.
On July 26, 2001, the defendant filed a motion for a restraining order which was granted by the court on August 13, 2001 by the court, McLachlan, J. (See affidavit in support thereof dated July 16, 2001 in the file.)
On August 13, 2001, counsel for the plaintiff and the defendant joined in a stipulation pendente lite as concerns the respective conduct of the plaintiff and the defendant and the obligations on both sides of the aisle.
On August 31, 2001, the defendant again filed a motion for contempt pendente tiLe making reference to the earlier granted restraining order. It does not appear, however, that that motion was acted upon.
There is in the file a certain stipulation pendente lite dated September 10, 2001 whereby the plaintiff and the defendant agree to the imposition of mutual restraining orders and the terms and conditions incident thereto. The stipulation is also executed by counsel of record on both sides.
On September 20, 2001, another motion for contempt was filed by counsel for the defendant. It does not appear that that motion was acted upon.
On January 7, 2002, the plaintiff filed a motion to enjoin as concerns a prohibition to be applied to the defendant with regard to the dissipation of certain assets. That motion was acted on by the court, CT Page 4315 Devine, J., on January 28, 2002 whereby the court accepted the agreement of the parties dated January 28, 2002 and its terms and conditions and made them orders of the court. The agreement is set forth with particularity within the confines of the file.
February 22, 2002, the plaintiff filed yet another motion for contempt pendente lite having to do with the automobile owned, operated or in the possession of the defendant. It does not appear that that motion was acted upon.
March 11, 2002, the defendant filed yet another motion for contempt pendente lite having to do with the purchase by the plaintiff of a new automobile allegedly in violation of the automatic orders. It does not appear that that motion was acted upon.
March 11, 2002, yet another motion for contempt was filed by the defendant as concerns a claim that names had been removed from certain life insurance wherein the defendant was the beneficiary thereof. It does not appear that that motion was acted upon.
On March 20, 2002, the defendant filed a financial affidavit with the court.
March 20th, 21st and 22nd, the plaintiff and the defendant with their respective counsel and their witnesses appeared before the court and the matter was heard to a conclusion.
The court makes the following findings of fact:
Both the plaintiff and the defendant, whose maiden name was Staci Meehan, were joined together in marriage in Las Vegas, Nevada on February 17, 1998.
Both the plaintiff and the defendant have been residents of this state for at least 12 months preceding the date of the filing of the complaint.
The marriage has irretrievably broken down with no reasonable prospect for reconciliation.
There are no minor children born to the defendant since the date of this marriage. No children have been born to the defendant since the date of the marriage to the present time.
Neither party is now nor have they been in the past the recipient of public assistance or welfare from the State of Connecticut or any town, CT Page 4316 city, municipality or subdivision thereof
The chronology of the court's findings tracks the sequence in which the witnesses were presented to the court.
From the testimony of the witness Jessica Hughes, the court finds that this witness and the defendant first met each other in 1999 while working at a restaurant known as The Ground Round in Groton. The defendant, at that time, worked as a waitress and then a bartender at that facility and the witness and the defendant would on occasion dine at that facility with others.
The witness Hughes lived for a period of time with the defendant and they engaged in social conduct together.
The witness Hughes was apparently not initially aware of the fact that the defendant was married.
The social activities of the witness Hughes and the defendant occurred on a regular basis at various establishments. Each apparently paid their own expenses for entertainment and nights out.
The witness and the defendant shared an apartment in Norwich along with other tenants; to wit, Darcy and Diane. The rent for the housing unit was $950.00 a month. The witness Hughes contributed $300.00 per month toward that cost. Various guests on occasion would come to the apartment and socializing occurred.
The time frame for the friendship of the witness Hughes and the defendant apparently extended for the period March 2000 to April 2001.
The witness Hughes testified that the defendant claimed continual verbal abuse on the part of the defendant's husband directed at the defendant.
There were frequent social activities and according to the witness Hughes on occasion the defendant was observed to be under the influence of strong drink.
The witness Hughes testified as to shopping sprees where she accompanied the defendant where fairly large sums were spent on clothing. Credit cards or cash were used to pay for these expenditures.
The witness Hughes and the defendant apparently also on occasion visited a tanning salon. CT Page 4317
There was an occasion in the spring of 2001 when the defendant went to Florida with a group of other young people at the time of what is called Spring Break. This was financed apparently in large part by the defendant's use of credit cards and funds from the plaintiff
The testimony was to the effect that the witness Hughes now resided with the plaintiff but strictly as a tenant and that the witness Hughes had a separate relationship that did not involve the plaintiff
This witness' testimony was in the nature of describing the social activities that took place in which both the witness and the defendant participated. The court feels that no useful purpose is served by going into detail as concerns the testimony of this witness insofar as it relates to the conduct of the defendant.
The witness Hughes appeared to be straightforward and as best the court can devine had no ulterior motive in testifying along the lines that she did as concerns her observations while a co-tenant with the defendant and others at their residence.
Eventually, according to the testimony, the witness Hughes disclosed to the plaintiff her observations as concerns the conduct of the defendant.
The plaintiff, although he apparently inadvertently financed some of the expenditures incident to the Florida trip, did not participate in the same.
No useful or salutary purpose would be served by dwelling at length as concerns this testimony.
Certain exhibits were presented to the court through this witness, which may be touched on in due course.
The witness Hughes testified that the defendant represented that she needed the plaintiff and his financial support and assistance with regard to her being able to finish her college education.
The witness Hughes is age 22; three years of college education and the residence during the friendship of the witness and the defendant was at 185 Sheraton Lane in Norwich.
From the testimony of the witness John Avery, the court finds that he met the defendant during the period 1998-1999 when the defendant was employed at The Ground Round restaurant.
This witness apparently was not aware of the marital status of the CT Page 4318 defendant at that time.
This witness was apparently a guest at the aforementioned residence on a number of occasions and participated in parties located at that location.
This witness observed certain conduct involving the defendant and strong drink and other matters, which the court feels there is no useful purpose served in recounting.
The witness Avery testified that insofar as the plaintiff was concerned he did not observe any inappropriate conduct on his part.
The witness Avery acknowledged that the witness Hughes is his girlfriend.
The witness Avery is age 23; in good health; has three years of college for an education; resides at 22 Pegasus Street in New London and indicated that the plaintiff has a friend whose name is Jillian.
The court was given to understand by counsel that there were no requests for alimony on the part of either the plaintiff or the defendant and that would appear to be borne out by virtue of the prayers for relief contained in the complaint and the cross complaint.
From the testimony of the defendant, the defendant verified the date and place of her marriage; established the requisite residency requirement; testified that the marriage has irretrievably broken down; that there are no children issue of this marital union nor has the defendant had any children from the date of the marriage to the present time; that she has not been the recipient of welfare or assistance from any source.
The defendant testified that she had a number of part-time or interim places of employment including The Ground Round restaurant, an establishment known as Sunset Ribs, was also employed at a time by Victoria's Secrets and Filene's. In addition, the defendant worked for a jeweler.
The defendant attended the University of Connecticut on a part-time basis.
The defendant at one point in time had a 1993 BMW motor vehicle which was sold in May of 2001 and the proceeds therefrom were applied on a purchase of a new 2001 BMW; that purchase being initially accomplished by a deposit of $10,000.00. The subject motor vehicle now held by the defendant apparently needs some repairs and was involved in an accident CT Page 4319 with a deer where certain damage was sustained.
The defendant testified that there were long periods of time during the marriage when the parties were apart from each other; the plaintiff being a member of the United States Navy in the area of nuclear propulsion or engineering.
The defendant has now graduated from the University of Connecticut with a degree in communications. She spent over 3-1/2 years in college and represented that she had paid for her educational expenses. Also, that she on occasion had treated with a medical practitioner, Dr. Argeri for depression.
The motor vehicle presently owned by the defendant when purchased was valued at $65,000.00, on which, apparently at one or subsequent points of time, payments have been made including a payment for $20,000.00. The subject vehicle has not yet been repaired and query as to the actual value thereof
The defendant indicated that the loan balance on the vehicle was now in the neighborhood of $35,000.00 and that overall the loan had been paid down by as much as $28,000.00. The funds to accomplish that purpose apparently came in one form or another from a gracious grandparent who gave the defendant certain certificates of deposit or other assets which allowed her to follow this course of conduct.
The defendant acknowledged the trip to Florida with other occupants of the unit she was occupying and the costs incident thereto.
The defendant testified that all together she may have received as much as $80,000.00 from a kind, generous and open-handed grandparent; query as to whether or not the grandparent would have put their blessing on the course that was followed as to its use.
One of the certificates of deposit apparently was cashed out to acquire some securities or stocks.
The defendant acknowledged that the plaintiff paid some of her living expenses.
Prior to the parties being joined in marriage, the defendant had been involved in an automobile accident wherein she received the sum of $10,000.00 as a result of injuries sustained therein.
The defendant represented that there were no alcohol-related problems in her conduct. CT Page 4320
At the time of the marriage the defendant was age 20. She is now age 24.
The plaintiff is age 25 at this time.
The defendant was born in 1977. The plaintiff was born in the same year.
The defendant characterized her health as good.
There were, as noted, periods of separation because of the plaintiff's service with the United States Navy; several of which were lengthy.
As the marriage deteriorated in the summer of 2000, the plaintiff moved in with his brother and there was apparently a physical altercation on one occasion between the defendant and the plaintiff's brother.
In the summer of 2000, the parties being separated, the plaintiff came to the home with a police escort to retrieve certain items of clothing and there was an issue and a dispute over certain funds in the amount of $4,000.00, which allegedly resulted in the plaintiff being arrested for disorderly conduct. What the ultimate disposition of that matter was, is unknown to the court as there was no testimony as to the eventual disposition nor any record of court presented.
Prior to the parties being joined in marriage, the defendant was in Bristol College for a period of two years. Starting in 1998, she attended Three Rivers College and starting in 2000 attended at the University of Connecticut.
Certain of the funds made available to the defendant through the kindness and affection of her grandparent ended up in an Ameritrade account.
A substantial portion of one of the CD's was spent to pay for credit card debt, school tuition expenses and car payments.
The defendant apparently, on occasion, has been treated by Dr. Treseri with regard to panic attacks and takes Prozac, which has been prescribed for her.
The defendant apparently has been taking this medication for the last six months.
The testimony was to the effect that the plaintiff gave the defendant his ATM card to use as concerns the trip to Florida; whether he was aware of the use to which it was put is a matter of conjecture. Apparently 15 CT Page 4321 young people went on the trip to Florida, driving down in one or more vehicles.
The defendant is not presently employed. Her debts according to the financial affidavit amount to $10,700.00+, plus late fees. Some of her obligations are now delinquent.
The defendant testified that there is as much as $6,000.00 due counsel; $2,500.00 has been provided as a retainer.
It was agreed between counsel and the parties that the defendant might have her grandmother's oriental rug as noted on one of the schedules attached to the appropriate financial affidavit.
The defendant's testimony was to the effect that the witnesses Hughes and Avery did not testify truthfully.
The plaintiff at the time of the parties being united in marriage was a member of the United States Navy. The plaintiff has now left the service with the United States Navy and is engaged in certain employment in New York, which the court will touch on in due course.
The plaintiff testified as to certain observations that he made at the residence of the defendant on the occasions when he would have returned from being at sea.
The plaintiff characterized the defendant's employment, while admittedly she was going to the University of Connecticut, as sporadic and that she did not hold positions for a very long period of time; that the defendant improvidently spent funds on social activities and parties and that the defendant ill-advisedly spent over $1,000.00 of his funds on the Florida trip.
It appears that the $4,000.00 earlier referenced was the balance of the $10,000.00 settlement funds that belonged to the defendant from her accident which had occurred prior to the parties being united in marriage.
The plaintiff acknowledged the altercation that had taken place between his brother and the defendant.
The parties, the plaintiff and the defendant, apparently did undertake some counseling but the same was not successful.
The plaintiff's position was to the effect that the defendant had a problem with regard to the immoderate use of strong drink. CT Page 4322
During the course of the marriage apparently the defendant had complete access to funds of the plaintiff and the plaintiff's claim is to the effect that he paid a substantial sum on the defendant's behalf with regard to support, maintenance and education. The plaintiff's posture was to the effect that the defendant was extravagant.
Some of the goods of the parties during the portion of the marriage when they resided together have now been in storage. The monthly storage fee is $200.00, which is being paid by the plaintiff.
The plaintiff in his release from Naval service adverted to a medical problem involving his back and the removal or rupture of a disc; this was sustained while he was in the Naval service and the plaintiff is awaiting action by a review board as concerns the nature and the extent of that injury.
The plaintiff claimed and represented that the defendant was now residing with a friend.
The plaintiff is presently employed by Saranac Power in Upper New York State. His weekly income, according to his testimony, is about $1,000.00. He may expect yearly bonuses in the future. He has yet to contribute to any 401K. He has only just recently received his first paycheck.
During the conduct of the marriage, the plaintiff's only employer was the United States Navy; his education and activities while in the Naval service was in nuclear power plants.
One of the issues between the parties with regard to the usual automatic orders on both sides of the aisle had to do with the purchasing or refinancing of motor vehicles, including on the plaintiff's part, the purchase or financing of a Pontiac Firebird motor vehicle, wherein a certain amount of cash was put down an earlier owned vehicle, an Eclipse, was at that juncture traded in by the plaintiff.
The plaintiff's lament in part was that he sought reimbursement with regard to the support and expenses that he had undertaken on behalf of the defendant including education, car insurance, clothing and matters of like nature.
As indicated, the plaintiff now resides in New York and according to the testimony has a friend in that state.
One of the plaintiff's requests of the court was to request that the CT Page 4323 court should order that the BMW automobile in the name of the defendant be sold and the plaintiff indicated that he would be willing to pay off the lien if the court should follow that request. How the plaintiff might be able to do that, predicated upon the nature of his financial affidavit, is a matter of conjecture and surmise.
The plaintiff testified that at one point in time he would have accepted the sum of $3,500.00 from the defendant if the matter could have amicably been resolved.
The plaintiff indicated that he had incurred or expected to incur over $6,000.00 worth of legal fees.
The plaintiff's education did not extend through securing a college degree although he received training and guidance in the United States Navy in nuclear engineering.
The plaintiff is now age 25. He describes his health as fair. He noted the back problem that he has with regard to the removal of a disc and that he is now waiting for a medical review board to act on the matter. The plaintiff served in the United States Navy for 6-1/2 years and attained the rating of a first class petty officer as a machimst mate. He was honorably discharged on October 15, 2001.
His formal education extended through completing high school and has indicated received education in nuclear energy and power while in the service.
During the course of the marriage, there was one occasion where the plaintiff was away at sea for six months and on one occasion, away for three months.
His employment with Saranac Power has just recently commenced.
The plaintiff made no claim for periodic alimony. There was no indication on either side of the aisle of physical violence between the parties; some reference to the immoderate use of alcohol.
The plaintiff requested or claimed the return of a certain man's silver bracelet and a video camera, which the court will consider.
From the various exhibits presented and offered to the court, the court finds as to Defendant's Exhibit 1, a statement from Ameritrade indicating a cash account balance of $25,000.00. The statement period was for January and February 2001. The exhibit continued through various statement periods and reflected a gradual diminishing of the value of the CT Page 4324 account; by way of example, in the March/April 2001 statement, the closing balance cash account was $7,031.06. The exhibit continued in like manner for subsequent periods of time and as representative thereof in May and June of 2001, the closing balance was as little as $255.61. The exhibit contained further statements in June and July indicating small balances. At the end of August 2001, the total account value was $18,460.00. In September, it dropped down to $13,000.00. In October, down to $9,000.00. In November, it increased to $15,294.00, and as of the period January 2002, the value appeared to be $1,047.62.
Defendant's Exhibit 2, a Citizen's Bank account statement under the name of Staci Meehan, the defendant. In June and July 2001, total deposit balance $13,134.00. Subsequent statements showed a continuing decline; as representative August/September 2001, the deposit balance was $9,512.64. In November 2001, the balance was $8,970.50 and the last statement from Citizen's, November 14, 2001, indicated a current balance of 0.
Defendant's Exhibit 3, a statement from Discover Platinum card in the name of Staci Cooper indicating prior balances, payments, reflected purchases. For the statement dated November 12, 2001, the statement reflects previous balance due, $8,750.13; payments and credits, $6,265.97. New balance as of the date of that statement, $2,679.75.
Defendant's Exhibit 4, invoice from the Auto Center BMW from Middletown, Rhode. Island indicating the purchase by the defendant of a 2001 BMW Model M3, convertible, for $64,220.00.
Defendant's Exhibit 5, University of Connecticut fee bill, Spring 2002, as concerns the defendant, Staci Beth Cooper, indicating charges of $8,214.00; credits, $8,214.00; balance due, 0.
Defendant's Exhibit 6, a statement from Bristol Community College as concerns the defendant wherein the defendant apparently attended summer school seeking three credits; total charges, $228.00, which appear to have been paid. Other earlier payments for periods of time prior to March 12, 2002 are reflected within the confines of this exhibit and indicate that they have been paid.
Defendant's Exhibit 7, a statement from Three Rivers Community College account receipt concerning Staci B. Cooper indicating and reflecting a payment to that educational facility in various amounts, including $222.00, $458.00, $478.00 incident to her educational pursuits.
Defendant's Exhibit 8, Department of Police, Norwich, Connecticut report as concerns the plaintiff who, according to the exhibit, was arrested on the charge of disorderly conduct on July 29, 2000 at premises CT Page 4325 known as 185 Sheraton Lane. The exhibit does not reflect the ultimate disposition of the matter.
Defendant's Exhibit 9, a lengthy typed statement created by the plaintiff containing a variety of rather vehement and colorful statements as concerns the conduct of the defendant. The plaintiff understandably was distressed as concerns the defendant's conduct during his intervals at sea with the Navy.
Defendant's Exhibit 10, various and sundry W-2's from various short-term periods of employment on the part of the defendant including The Ground Round, Sunset Ribs. This exhibit also contains a copy of the 1998 federal income tax return. The adjusted gross income on this joint return for 1998 was $22,921.00.
Defendant's Exhibit 11, W-2's from the military for the plaintiff and copy of the 1999 federal income tax return filed jointly indicating that the adjusted gross income for that year for the parties was $23,701.00.
Defendant's Exhibit 12, photocopies of W-2's concerning further employment of the defendant at various locations, various employers including Charlotte Russe in San Diego, California. Also, as part of the exhibit, the joint federal income tax return for 2000 for the parties indicating total adjusted gross income for that year to be $26,709.00.
From the exhibits offered by the plaintiff, Plaintiff's Exhibit 1, 8, 9, 10, 11 and 12 are a series of photographs which the court feels it is not necessary to embellish on.
Plaintiff's Exhibits 2 and 3 are voluminous deposition documents which the court has perused but feels that no useful purpose would be served by dwelling in any detail as to the contents thereof. The court notes that Plaintiff's Exhibits 2 and 3 were apparently offered by agreement as full exhibits and not apparently precisely for the point of contradicting evidence adduced at time of trial, which is ordinarily the procedure resorted to. Mindful of the overall circumstances pertaining to this trial seeking a dissolution of the union, again, the court sees no necessity or compelling reason to dwell overly long on these two extensive depositions, which really do not materially advance the issues nor are they of great help or assistance to the court.
Plaintiff's Exhibit 4, the State of Connecticut Department of Motor Vehicles title certificate as concerns the earlier BMW owned by the defendant, a 1993, with insurance data attached thereto. The purchase invoice is also attached as are collateral documents including repairs to the 1993 BMW, which of course is no longer an asset of either of the CT Page 4326 parties.
Plaintiff's Exhibit 5, an unsigned financial affidavit presumably earlier offered on behalf of the defendant indicating her status as a student, zero income, another financial affidavit, having in mind that the exhibit does not contain the signature of the defendant, the court is inclined to disregard it.
Plaintiff's Exhibit 6, the face sheet stating notice of compliance as concerns certain motions, requests for disclosure and production and a variety of documents apparently indicating basically a compliance with the motion.
Plaintiff's Exhibit 7, a Valentine's Day card from the defendant to the plaintiff indicating an ongoing warmth and affection as between the parties.
Plaintiff's Exhibit 13, a lengthy invoice of purchases allegedly attributable to the defendant from Victoria's Secret.
Plaintiff's Exhibit 14, SNET statement for services to a phone under the listing of the witness Jessica Hughes indicating various calls made, which were outlined in light green, allegedly attributable to calls made by the defendant to various Mends and acquaintances.
Plaintiff's Exhibit 15, military pay records from the Navy to the plaintiff covering an extended period of time showing his base pay, additional pay for submarine duty, sea pay, special duty pay and allied matters of like nature.
Plaintiff's Exhibit 16, a document from Navy Federal Credit Union entitled Share Savings Account in the name of the plaintiff, Randall J. Cooper, showing a continuing modest balance with regard to that account. The same never exceeding more than $2,500.00 at any particular one time. Presumably this is reflective of payments paid into the federal credit union by the plaintiff from his earnings incident to his service with the Navy.
From the financial affidavits of the plaintiff and the defendant filed at the time of trial, the court notes as to the defendant, her present occupation is that of being unemployed. Weekly expenses as reflected on the affidavit, $633.68. Debt to Discover Card, Mastercard, Sears Mastercard and CitiBank totals $10,700.00+. No real estate listed. The motor vehicle of the defendant, the 2001 BMW convertible, is valued on the affidavit at $36,600.00; loan balance, $35,600.00 for an equity of $1,000.00. CT Page 4327
No exhibit was offered to the court with regard to something like the NADA valuation book and of course the testimony was to the effect that the vehicle has been damaged; the repairs have not been completed and therefore query as to its actual value at this time.
The defendant lists the value of her Ameritrade account at $1,124.20. Other assets; to. wit, personal property as reflected on an attached schedule, allegedly amounting to $13,925.00 of which one item, the Oriental rug given to the defendant by her grandmother, was valued at $8,000.00, constituting the major valuation of the items shown in the list.
From the plaintiff's financial affidavit, his occupation is listed as control operator for Saranac Power in Plattsburg, New York. Gross weekly wage, $1,000.00; deductions totaling $281.00; for a net of $716.00. The affidavit in the portion of the form entitled total net weekly income shows $474.00. How that is arrived at is a matter of conjecture. Weekly expenses, $508.50; debt, Mastercard and Visa totaling $8,000.00. No real estate. A 2001 Pontiac Firebird automobile valued at $29,000; loan balance, $28,000.00; equity, $1,000.00. Miscellaneous including a computer, $2,500.00. $1,050.00 checking and savings. No other assets shown.
On the basis of the health form, also entitled "Dissolution of Marriage Report," the court notes that this was the first marriage for both; that the husband's education extended through, according to the form, one year in college and the defendant wife, four years or a college degree. No other relevant information appears on the form.
 The Law
The court has considered all of the statutes which apply in matters of this nature which include without limitation Connecticut General Statutes (C.G.S.) § 46b-82 regarding alimony.
The court has considered all of the applicable case law that governs the matter.
The court has considered the testimony of the parties, their candor or lack thereof, the' various and sundry exhibits and the arguments of counsel.
Although neither party made any request for alimony, either periodic or lump sum, the court, of necessity, reflected upon the length of the marriage, the cause of the breakdown and dissolution, the age, health, CT Page 4328 station, occupation and employability of each of the parties and the estate or lack thereof of each of the parties and their needs.
The court has considered the respective financial positions of the parties including the present unemployed status on the part of the defendant, their prospects for future income and opportunities.
The court has considered the issue of fault mindful of the nature of the testimony presented and the pleadings.
 Discussion
This is an exceptionally short marriage.
The parties were in their early twenties when they entered into the union. The plaintiff husband was in the military service. The defendant wife was engaged in educational pursuits.
There were no children issue of this marital union.
It was the first marriage for each of the parties.
Undoubtedly, the plaintiff petitioner was distressed upon being advised as to the conduct of the defendant during his absences at sea; two of which admittedly were quite lengthy. On the other side of the coin, the age of the parties being what they were and the housing circumstances entered into by the defendant living with other young ladies and having a rather fast paced social life is understandable in some respects although not approved by the court.
As indicated, the court feels that there is no useful purpose served in dwelling in detail on the testimony presented to the court.
It may well be that there were some problems with regard to the immoderate use of strong drink by the defendant. There was no affirmative evidence of substance abuse nor physical violence as between the plaintiff and the defendant.
Apparently, both of the parties have a fairly good education; the defendant now has a college degree, which admittedly she was able to achieve with help and assistance provided by the plaintiff and on the other side of the coin, the plaintiff clearly was the beneficiary of training, expertise and education in the U.S. Naval service whereby he now has what appears to be a fairly good position with Saranac Power in the nuclear power environment. CT Page 4329
Neither party appear to have any serious medical problems. Clearly, the defendant was extremely improvident with regard to the purchase of the BMW automobiles. It was only through the kindness, charity and presumably love and affection of her grandparent that she was able to achieve this.
The defendant would have been much more well advised to have carefully husbanded the gifts for future financial stability but instead embarked upon the course which has been recited in these proceedings.
The court enters the following orders:
The court dissolves the marriage of the parties on the grounds of irretrievable breakdown and declares the parties to be single and unmarried.
Mindful of the state of the record and the conduct by both the plaintiff and the defendant as concerns assets or motor vehicles, the court declines to make a finding of contempt as to either of the parties.
As noted in the body of the memorandum, counsel presented the court with two lengthy transcripts and the court has been requested to sanction the defendant as concerns contrasts between the content of the transcripts and the testimony adduced at trial. The court declines to do so.
The educational cost incurred by the defendant incident to her ongoing college education, certainly in large measure, was paid for by the generosity, kindness and understanding of a grandparent and the plaintiff's ongoing contributions in the area of some educational costs, matters like car insurance and clothing, are expenses that are ordinarily incurred within the confines of a marital union.
The court in the defendant's proposed orders was requested to continue a restraining order as concerns the parties, but mindful of the present state of residence, the plaintiff being in the State of New York and the defendant here, the court perceives no necessity for doing that at this time.
The plaintiff may retain title to his 2001 Pontiac Firebird automobile presently standing in his name and be responsible for any debts or obligations incident thereto.
The plaintiff shall have returned to him the man's silver bracelet adverted to during the testimony and the video camera adverted to in the testimony, both presently in the possession of the defendant. CT Page 4330
As concerns the itemized list of personal property that was attached to the defendant's financial affidavit, and on the basis of those items checked off by the plaintiff during the conduct of the proceedings, the plaintiff may have the queen bed and mattress, the dryer, the computer, the white couch, bookshelf, entertainment center. The other items appearing on that list; to wit, oversized chair, coffee table, bureau and grandmother's rug shall be the sole and separate property of the defendant and delivered over to her from storage within a period of 30 days.
The defendant may retain title to the 2001 BMW convertible motor vehicle valued at $36,000.00 with a loan balance of $35,600.00 for an equity of $1,000.00 and be responsible for all costs, charges, liens or obligations incident thereto. As noted in the body of the opinion, this vehicle has been damaged and the court is inclined to the view that in the very near term it is more than likely that the title to the same will be lost by the defendant's inability to continue with the periodic payments.
The defendant may retain the Ameritrade account valued at $1,124.20.
The defendant may retain her Citizen's Bank checking account which has a nominal value.
The court enters no order as to periodic alimony as to either the plaintiff or the defendant. Each party shall be responsible for the debts appearing on their respective financial affidavits.
Each party shall be responsible for their own attorney's fees.
The court grants the defendant's request for restoration of her maiden name and henceforth she shall be known as Staci Meehan.
The plaintiff shall be entitled to keep and retain the items shown on his financial affidavit entitled "Miscellaneous HHF," except as they may be in conflict with the earlier order of the court, the plaintiff may retain the computer shown on his affidavit as well as his NFCU checking and savings account totaling $1,050.00.
There is no necessity for the court to consider any assets such as a 401K or retirement plans and matters of like nature as none apparently presently exist.
The plaintiff may keep and retain sole ownership of his SGLI life insurance policy although no value is set forth on the plaintiff's CT Page 4331 financial affidavit incident thereto.
Austin, J.